UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN J. GERNETH, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CHIASMA, INC., MARK W. LEUCHTENBERGER, and MARK J. FITZPATRICK, <br><br> Defendants. | Case No. <br><br> COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff John J. Gerneth ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chiasma, Inc. ("Chiasma" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Chiasma securities: (1) pursuant and/or traceable to Chiasma's false and misleading Registration Statement and Prospectus issued in connection with the Company's initial public offering on or about July 15, 2015 (the "IPO" or the "Offering"); and/or (2) on the open market between July 15, 2015 and April 17, 2016, both dates inclusive, seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") (the "Class").

2.      Chiasma, a late-stage biopharmaceutical company, focuses on developing and commercializing oral forms of therapies for patients suffering from orphan diseases. Chiasma was founded in 2001 and is headquartered in Newton, Massachusetts. The Company's stock trades on the NASDAQ under the ticker symbol "CHMA."

3.      The Company's lead product candidate is oral octreotide, or Mycapssa, for the treatment of acromegaly, a condition that results in the body's production of excess growth hormone. As of June 2015, prior to Chiasma's IPO, the Company had completed a multinational Phase 3 clinical trial of Mycapssa and submitted a new drug application ("NDA") to the U.S. Food and Drug Administration ("FDA") seeking approval for marketing and sale of Mycapssa.

4.      On or about July 15, 2016, Chiasma completed its IPO, issuing 6.4 million shares and raising net proceeds of approximately $102 million.

5.      Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Chiasma's Phase 3 clinical trial methodology for Mycapssa was not sufficient to demonstrate efficacy and secure FDA approval;

(ii) Chiasma's supervision of its suppliers was not sufficient to prevent deficiencies that would delay FDA approval of Mycapssa; and (iii) as a result of the foregoing, Chiasma's public statements were materially false and misleading at all relevant times.

6.      On April 18, 2015, before the market opened, the Company announced that the FDA had issued a Complete Response Letter regarding its New Drug Application for Mycapssa. In a press release, Chiasma stated, in part:

> Upon completion of its review, the FDA advised Chiasma that the Agency did not believe the company's application had provided substantial evidence of efficacy to warrant approval, and advised Chiasma that it would need to conduct another clinical trial in order to overcome this deficiency. The FDA expressed concerns regarding certain aspects of the company's single-arm, open-label Phase 3 clinical trial and strongly recommended that the company conduct a randomized, double-blind and controlled trial that enrolls patients from the United States and be of sufficiently long duration to ensure that control of disease activity is stable at the time point selected for the primary efficacy assessment. In addition, the FDA advised that, during a recent site inspection, certain deficiencies were conveyed to the representative of one of Chiasma's suppliers that would need to be resolved before approval.

7.      On this news, Chiasma's share price fell $6.42, or 63.13%, to close at $3.75 on April 18, 2016.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5)

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendant Chiasma maintains its principal executive offices in this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff purchased or otherwise acquired Chiasma common stock as described in the attached certification, which is incorporated herein by reference, and was damaged by the revelation of the alleged wrongdoing.

14.     Defendant Chiasma's principal executive offices are located at 60 Wells Avenue, Suite 102, Newton, Massachusetts 02459.  Chiasma's stock trades on the NASDAQ under the ticker symbol "CHMA."

15.     Defendant Mark W. Leuchtenberger ("Leuchtenberger") has served at all relevant times as the Company's Chief Executive Officer.

16.     Defendant Mark J. Fitzpatrick ("Fitzpatrick") has served at all relevant times as the Company's Chief Financial Officer.

17.     The Defendants described in ¶¶ 15-16 are sometimes hereinafter collectively referred to as the "Individual Defendants."

## Background

18.     Chiasma, a late-stage biopharmaceutical company, focuses on developing and commercializing oral forms of therapies for patients suffering from orphan diseases.  Chiasma was founded in 2001 and is headquartered in Newton, Massachusetts.

19.     The Company's lead product candidate is oral octreotide, or Mycapssa, for the treatment of acromegaly, a condition that results in the body's production of excess growth hormone.  As of June 2015, prior to Chiasma's IPO, the Company had completed a multinational Phase 3 clinical trial of Mycapssa and submitted an NDA to the FDA seeking approval for marketing and sale of Mycapssa.

20.     On April 17, 2015, Chiasma filed a draft registration statement with the SEC in connection with the Company's IPO.  The draft registration statement was subsequently amended several times, and the final amended registration statement was filed with the SEC on July 15, 2015 (collectively, the "Registration Statement").

21.     The Registration Statement contained a preliminary prospectus.  The final prospectus (the "Prospectus") was filed with the SEC on July 16, 2015.

22.     On July 15, 2015, the SEC declared the Registration Statement and Prospectus effective.

23.     On or about July 15, 2016, Chiasma completed its IPO, issuing 6.4 million shares and raising net proceeds of approximately $102 million.

## The Alleged False and Misleading Statements

24.     On July 16, 2015, Chiasma filed its final Prospectus with the SEC, which forms part of the Registration Statement and which the SEC declared effective as of July 15, 2015.  In the Prospectus, Chiasma stated, in relevant part:

We have completed a multinational Phase 3 clinical trial of our most advanced TPE platform-based product candidate, oral octreotide, for the treatment of acromegaly, a condition that results in the body's production of excess growth hormone. Octreotide is an analog of somatostatin, a natural inhibitor of growth hormone secretion. We believe that our lead product candidate, if approved by regulatory authorities, will be the first somatostatin analog available for oral administration. Our oral octreotide product candidate has been granted orphan designation in the United States and the European Union for the treatment of acromegaly. We submitted a new drug application, or NDA, to the U.S. Food and Drug Administration, or FDA, on June 15, 2015, seeking approval for the marketing and sale of oral octreotide for the maintenance therapy of adult patients with acromegaly. The FDA has 60 days after receipt of the NDA to preliminarily review and determine if the application is sufficiently complete to permit a substantive review and meets the threshold for filing. In light of our clinical data and feedback from patients and healthcare providers, we believe that oral octreotide, if approved, could become a new standard of care in acromegaly.

. . .

In our Phase 3 clinical trial, we observed that oral octreotide maintained biochemical disease control and improved symptom control. In this 155-patient Phase 3 clinical trial designed to evaluate oral octreotide in acromegaly patients already controlled on injectable somatostatin analogs, 65% of patients receiving oral octreotide twice a day for up to seven months achieved the primary endpoint, maintenance of biochemical disease control. This biochemical disease control was durable and 86% of patients who completed the seven-month core treatment period of the trial elected to continue on oral therapy during the six-month extension phase, for up to a total of 13 months of treatment after first dosing, rather than switch back to injections. In the majority of patients in our trial, oral octreotide achieved comparable biochemical disease control and reduced incidence and severity of acromegaly symptoms relative to injectable somatostatin analogs currently used to treat this disease. The adverse events observed for oral octreotide were similar to those previously reported for injectable somatostatin analogs, but without injection-site reactions.

Based in part on the data from our Phase 3 clinical trial, we submitted an NDA on June 15, 2015 seeking approval for the marketing and sale of oral octreotide for the maintenance therapy of adult patients with acromegaly. Assuming the FDA reviews and responds to our NDA in accordance with the goals and policies agreed to by the FDA under the Prescription Drug User Fee Act, or PDUFA, and subject to the FDA's acceptance of the NDA for filing, we anticipate a regulatory decision on marketing approval in April 2016. To support approval by the European Medicines Agency, or the EMA, and subject to final agreement with the EMA on the protocol for the trial, we intend to initiate an additional Phase 3 clinical trial of oral octreotide in acromegaly in the second half of 2015 in the United States and internationally to show parallel comparative safety and effectiveness as required by the EMA.

Assuming we receive favorable results from this second Phase 3 clinical trial, we expect to submit a marketing authorization application, or MAA, to the EMA in late 2017 or early 2018. In addition, if we receive regulatory approval of oral octreotide in acromegaly, we expect to initiate a Phase 2 clinical trial of oral octreotide in the second half of 2016 for the symptomatic control of neuroendocrine tumors, or NET, which are currently treated predominantly by injectable somatostatin analogs.

. . .

[M]anufacturers of drug products and their facilities are subject to continual review and periodic inspections by the FDA and other regulatory authorities for compliance with cGMP and other regulations. If we or a regulatory authority discover previously unknown problems with a product, such as adverse events of unanticipated severity or frequency, or problems with the facility where the product is manufactured, we may recall or withdraw the product from the market or a regulatory authority may impose restrictions on that product, the manufacturing facility or us, including requiring suspension of manufacturing. If we, our products or the manufacturing facilities for our products fail to comply with applicable regulatory requirements, a regulatory authority may:

- issue warning letters or untitled letters;
- mandate modifications to promotional materials or require us to provide corrective information to healthcare practitioners;
- require us to enter into a consent decree, which can include imposition of various fines, reimbursements for inspection costs, required due dates for specific actions and penalties for noncompliance;
- seek an injunction or impose civil or criminal penalties or monetary fines;
- suspend or withdraw regulatory approval;
- suspend any ongoing clinical trials;
- refuse to approve pending applications or supplements to applications filed by use;
- suspend or impose restrictions on operations, including costly new manufacturing requirements; or
- seize or detain products, refuse to permit the import or export of products, or request that we initiate a product recall.

25.     The Registration Statement, which incorporated the Prospectus, was signed by the

Individual Defendants among others.

26.     On August 31, 2015, Chiasma filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the

"Q2 2015 10-Q").  For the quarter, Chiasma reported a net loss of $7.77 million, or $50.36 per diluted share, on zero revenue.

27.     In the Q2 2015 10-Q, Chiasma stated, in part:

On June 15, 2015, we submitted an NDA to the FDA, for oral octreotide for the maintenance therapy of acromegaly, which has been accepted for filing to permit a substantive review. The FDA has set a target PDUFA date of April 15, 2016. In addition, we intend to initiate an additional Phase 3 clinical trial of oral octreotide in acromegaly in the second half of 2015 to show comparative effectiveness as required by the European Medicines Agency, or the EMA, to support approval. Initiation of this planned Phase 3 clinical trial is subject to our final agreement with the EMA on the protocol for this trial, which could be delayed. The FDA may not approve our NDA and our planned Phase 3 clinical trial may not be successful and therefore we may never receive approval to market oral octreotide in the United States, Europe or elsewhere.

28.     The Q2 2015 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.     On November 16, 2015, Chiasma filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, Chiasma reported a net loss of $9.36 million, or $0.46 per diluted share, on zero revenue.

30.     In the Q2 2015 10-Q, Chiasma stated, in part:

On June 15, 2015, we submitted an NDA to the FDA, for oral octreotide for the maintenance therapy of acromegaly, which has been accepted for filing to permit a substantive review. The FDA has set a target PDUFA date of April 15, 2016. In addition, we intend to initiate an additional Phase 3 clinical trial of oral octreotide in acromegaly by early in the second quarter of 2016 to show comparative effectiveness as required by the European Medicines Agency, or the EMA, to support approval. In October 2015, the European Medicines Agency, or EMA, accepted the design, enrollment criteria and required duration of Chiasma's Phase 3 trial to evaluate the non-inferiority of oral octreotide to injectable somatostatin analogs. This is an open-label, randomized, active-controlled study that is

anticipated to include approximately 150 patients in the European Union, the United States and certain other countries. The FDA may not approve our NDA and our planned Phase 3 clinical trial may not be successful and therefore we may never receive approval to market oral octreotide in the United States, Europe or elsewhere.

31.     The Q3 2015 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.     On March 17, 2016, Chiasma filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2015 10-K"). For the quarter, Chiasma reported a net loss of $14.53 million, or $0.61 per diluted share, on zero revenue. For 2015, Chiasma reported a net loss of $35.91 million, or $3.25 per diluted share, on zero revenue, compared to a net loss of $2.01 million on revenue of $13.17 million for 2014.

33.     In the 2015 10-K, Chiasma stated, in part:

Our lead product candidate, octreotide capsules or MYCAPSSA, is the first somatostatin analog formulated for oral administration to complete a Phase 3 clinical trial and demonstrate clinical proof of concept in treating patients with acromegaly. In our initial Phase 3 clinical trial, we observed that octreotide capsules maintained reduced levels of GH and IGF-1, or biochemical disease response, and improved symptom control. In this 155-patient Phase 3 clinical trial designed to evaluate octreotide capsules in acromegaly patients previously controlled on injectable somatostatin analogs, 65% of patients receiving octreotide capsules twice a day for up to seven months achieved the primary endpoint, maintenance of biochemical response. This biochemical response was durable and 86% of patients who completed the seven-month core treatment period of the trial elected to continue on oral therapy during the six-month extension phase for up to a total of 13 months of treatment after first dosing, rather than switch back to injections. In the majority of patients in our trial, octreotide capsules achieved comparable biochemical response and reduced incidence and severity of acromegaly symptoms relative to injectable somatostatin analogs currently used to treat this disease. The adverse events observed for octreotide capsules were similar to those previously reported for injectable somatostatin analogs, but without injection-site reactions.

Based in part on the data from our Phase 3 clinical trial, we submitted an NDA on June 15, 2015 seeking approval for the marketing and sale of octreotide capsules for the maintenance therapy of adult patients with acromegaly. We anticipate a regulatory decision by the FDA on marketing approval on the PDUFA date of April 15, 2016. To support approval by the European Medicines Agency, or the EMA, we initiated an additional international Phase 3 clinical trial of octreotide capsules in acromegaly in March 2016 to show parallel comparative safety and effectiveness as required by the EMA. Assuming we receive favorable results from this second Phase 3 clinical trial, we expect to submit a marketing authorization application, or MAA, to the EMA in 2019. In addition, if we receive regulatory approval of octreotide capsules in acromegaly, we expect to initiate a clinical trial in the second half of 2016 to support development for neuroendocrine tumors, or NET, which are currently treated predominantly by injectable somatostatin analogs, and a clinical trial in 2017 for another new indication.

We believe that approximately 8,000 adult acromegaly patients are chronically treated with somatostatin analogs in the United States, and that approximately 90% of these patients are managed by fewer than 1,000 accounts. Patients with acromegaly undergoing treatment in the United States are treated by endocrinologists at a small number of academic institutions with pituitary experts (pituitary centers), regional academic centers or hospital systems (regional referral centers) and some community endocrinologists. We believe we will be able to market octreotide capsules, if approved, directly to pituitary centers, regional referral centers and high-volume community endocrinologists through our own targeted sales force. We also intend to engage in direct patient outreach efforts. We believe that the clinical benefits and preferences of patients and healthcare professionals for an oral product together with our patient-centric approach could enable octreotide capsules, if approved, to become a new standard of care in acromegaly.

. . .

[M]anufacturers of drug products and their facilities are subject to continual review and periodic inspections by the FDA and other regulatory authorities for compliance with cGMP and other regulations. If we or a regulatory authority discover previously unknown problems with a product, such as adverse events of unanticipated severity or frequency, or problems with the facility where the product is manufactured, we may recall or withdraw the product from the market or a regulatory authority may impose restrictions on that product, the manufacturing facility or us, including requiring suspension of manufacturing. If we, our products or the manufacturing facilities for our products fail to comply with applicable regulatory requirements, a regulatory authority may:

- issue warning letters or untitled letters;

- mandate modifications to promotional materials or require us to provide corrective information to healthcare practitioners;
- require us to enter into a consent decree, which can include imposition of various fines, reimbursements for inspection costs, required due dates for specific actions and penalties for noncompliance;
- seek an injunction or impose civil or criminal penalties or monetary fines;
- suspend or withdraw regulatory approval;
- suspend any ongoing clinical trials;
- refuse to approve pending applications or supplements to applications filed by use;
- suspend or impose restrictions on operations, including costly new manufacturing requirements; or
- seize or detain products, refuse to permit the import or export of products, or request that we initiate a product recall.

34.     The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     The statements referenced in ¶¶ 24-34 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Chiasma's Phase 3 clinical trial methodology for Mycapssa was not sufficient to demonstrate efficacy and secure FDA approval; (ii) Chiasma's supervision of its suppliers was not sufficient to prevent deficiencies that would delay FDA approval of Mycapssa; and (iii) as a result of the foregoing, Chiasma's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

36.     On April 18, 2016, before the market opened, the Company announced that the FDA had issued a Complete Response Letter regarding its New Drug Application for Mycapssa. In a press release, Chiasma stated, in part:

11

Upon completion of its review, the FDA advised Chiasma that the Agency did not believe the company's application had provided substantial evidence of efficacy to warrant approval, and advised Chiasma that it would need to conduct another clinical trial in order to overcome this deficiency. The FDA expressed concerns regarding certain aspects of the company's single-arm, open-label Phase 3 clinical trial and strongly recommended that the company conduct a randomized, double-blind and controlled trial that enrolls patients from the United States and be of sufficiently long duration to ensure that control of disease activity is stable at the time point selected for the primary efficacy assessment. In addition, the FDA advised that, during a recent site inspection, certain deficiencies were conveyed to the representative of one of Chiasma's suppliers that would need to be resolved before approval.

37.     On this news, Chiasma's share price fell $6.42, or 63.13%, to close at $3.75 on April 18, 2016.

38.     As a result of Defendants' false and/or misleading statements, Chiasma securities traded at inflated prices. However, after disclosure of Defendants' false and/or misleading statements, Chiasma's stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class (as defined *supra* at ¶ 1). Excluded from the Class are defendants and their family members, directors and officers of Chiasma and their families and affiliates.

40.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Chiasma has more than 24 million shares of stock outstanding, owned by hundreds or thousands of persons.

41.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether the Securities Act was violated by defendants;

(b)     Whether the Exchange Act was violated by defendants;

(c)     Whether defendants omitted and/or misrepresented material facts;

(d)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(f)     Whether the price of Chiasma common stock was artificially inflated; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

42.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

43.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

45.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Chiasma common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

46.     At all relevant times, the market for Chiasma's common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, Chiasma filed periodic public reports with the SEC; and

(b) Chiasma regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services. As a result of the foregoing, the market for Chiasma's securities promptly digested current information regarding Chiasma from all publicly available sources and reflected such information in Chiasma's stock price.  Under these circumstances, all purchasers of Chiasma's securities at

relevant times suffered similar injury through their purchases of Chiasma's securities at artificially inflated prices, and a presumption of reliance applies.

## COUNT I
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Chiasma's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

49.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Chiasma securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Chiasma as specified herein.

51.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Chiasma's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Chiasma and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Chiasma securities.

52.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts, among others: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company at all relevant times and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business prospects and operations; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and business projects at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

53.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's flawed manufacturing processes, thereby artificially inflating price of its securities. As demonstrated by Defendants' omissions and misstatements of the Company's business strategy, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

54.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Chiasma securities was artificially inflated. In ignorance of the fact that market prices of Chiasma's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class acquired Chiasma securities at artificially high prices and were or will be damaged thereby.

55.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's flawed manufacturing processes, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Chiasma securities, or, if they had

acquired such securities, they would not have done so at the artificially inflated prices that they paid.

56.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities.

58.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II
### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of Chiasma within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

61.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, Chiasma and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

63.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities.

64.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

### COUNT III
### Violation of Section 11 of
### The Securities Act Against All Defendants

65.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

66.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants.

67.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

68.     Chiasma is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

69.     As issuer of the shares, Chiasma is strictly liable to Plaintiff and the Class for the misstatements and omissions.

70.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

71.     By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

72.     Plaintiff acquired Chiasma securities pursuant and/or traceable to the Registration Statement for the IPO.

73.     Plaintiff and the Class have sustained damages. The value of Chiasma securities has declined substantially subsequent to and due to the Individual Defendants' violations.

**COUNT IV**
**Violation of Section 15 of**
**The Securities Act Against the Individual Defendants**

74.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

75.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

76. Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Chiasma within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Chiasma to engage in the acts described herein.

77. Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

*****

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

///

///

///

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 9, 2016

Respectfully submitted,

**BLOCK & LEVITON LLP**

*/s/ Jason M. Leviton*
Jason M. Leviton (BBO# 678331)
Steven Harte (BBO# 667948)
155 Federal Street, Suite 400
Boston, MA 02110
Tel: 617-398-5600
Fax: 617-507-6020
Email:  Jason@blockesq.com
        Steven@blockesq.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*