UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN J. GERNETH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CHIASMA, INC., MARK W. LEUCHTENBERGER, MARK J. FITZPATRICK, DAVID STACK, DROR BRANDWEIN, TODD FOLEY, ANSBERT GADICKE, BARD GEESAMAN, VINCENT MILES, SCOTT MINICK, JOHN SCARLETT, BARCLAYS CAPITAL INC., COWEN AND COMPANY, LLC, WILLIAM BLAIR & COMPANY, L.L.C., OPPENHEIMER & CO., INC.,<br><br>Defendants. | No. 1:16-cv-11082-DJC<br><br><u>CLASS ACTION</u><br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ....1

II. JURISDICTION AND VENUE ....4

III. PARTIES ....4

IV. BACKGROUND ....10

A. The FDA Regulatory Regime ....10

B. Background on Chiasma's Development of Mycapssa ....13

C. Clinical Studies of Mycapssa ....16

1. Phase 1 Clinical Trials ....16

2. Phase 3 Clinical Trial ....17

D. Chiasma's Short-Lived Agreement with Roche to Develop and Commercialize Mycapssa ....20

E. Chiasma and the FDA Met Prior to the Mycapssa NDA Submission ....22

F. 505(b)(2) Approval Pathway ....23

G. Chiasma's IPO ....24

H. The FDA Rejects Chiasma's NDA as Submitted ....25

V. FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....26

A. The Phase 3 "Trial Results" Were Presented in a Materially Misleading Manner ....26

B. The Registration Statement Informed Investors Chiasma Would Benefit from the 505(b)(2) Regulatory Pathway ....30

C. The Registration Statement Misrepresented the Nature of Roche Terminating Its Partnership with Chiasma ....34

VI. POST-IPO EVENTS ....36

VII. CLASS ACTION ALLEGATIONS ....40

VIII. PRAYER FOR RELIEF ....44

Lead Plaintiff Laurent Sberro ("Lead Plaintiff") alleges the following based upon the investigation of Lead Plaintiff's counsel, which included a review of Chiasma, Inc.'s ("Chiasma" or the "Company") United States Securities and Exchange Commission ("SEC") filings, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, news releases and other public statements issued by the Company, and media reports about the Company.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons who purchased or acquired common stock issued by Chiasma pursuant or traceable to the Company's initial public offering held on or about July 15, 2015 (the "IPO"), seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") (codified at 15 U.S.C. §§77k and 77o). This action is brought against Chiasma, certain officers and directors, and the investment banks that underwrote the IPO.

2. The offering materials used in connection with the Company's IPO included a registration statement filed with the SEC on Form S-1 on or about June 15, 2015 (File No. 333-204949), one amendment thereto filed with the SEC on July 6, 2015 on Form S-1/A, and a prospectus on Form 424(b)(4), filed with the SEC on or about July 15, 2015. On July 15, 2015, the SEC declared the registration statement and prospectus effective. The prospectus states it constitutes a part of the registration statement. The registration statement, amendment thereto, and prospectus utilized in connection with the IPO are hereafter referred to as the "Registration Statement."

3. Chiasma describes itself as "a late-stage biopharmaceutical company focused on improving the lives of patients suffering from orphan diseases by developing and commercializing novel oral forms of therapies that are available today only by injection." Chiasma's business model is to use its proprietary Transient Permeability Enhancer ("TPE") technology to develop oral forms of drugs that are only available as injections. According to Chiasma, because the drugs have already been approved for injection, it could rely on prior safety and efficacy data when applying for approval, avoiding long and costly trials. At the time the Registration Statement became effective, the Company was attempting to use its TPE technology to create an oral capsule form of the

injectable drug octreotide. Chiasma assigned the oral octreotide capsule the trade name "Mycapssa" (formerly known by the trade name "Octreolin"), and it was being developed for the treatment of acromegaly, a condition that results in the body's production of excess growth hormone.

4. Since it commenced operations as a private company in 2001, Chiasma has focused its efforts on raising capital and developing Mycapssa, including undertaking non-clinical studies and conducting clinical trials. Mycapssa is the only drug candidate for which Chiasma has conducted clinical trials. Once Mycapssa was approved, and the TPE technology was justified, Chiasma planned to use the technology to develop other drugs that are currently only available as injections. Thus, the future success of the Company hinged on getting Mycapssa approved on a shorter development timeline and with lower associated expenses, thereby proving that the same could be done with other injectable drugs.

5. The treatment for acromegaly is a lucrative business. According to the Company's Registration Statement, the worldwide market for injectable somatostatin analogs is approximately $2.0 billion annually, of which approximately $730 million represents annual sales for the treatment of acromegaly. Hoping to tap into this $2.0 billion market, Swiss pharmaceutical companies F. Hoffmann-La Roche Ltd. and Hoffmann-La Roche Inc. (collectively, "Roche") announced a licensing deal with Chiasma in February 2013. In exchange for paying Chiasma $65 million up front, $530 million in development and commercial milestones, and double-digit royalties on sales of Mycapssa, Roche obtained the right to develop and commercialize Mycapssa upon its approval.

6. In July 2014, just after its May 2014 pre-new drug application ("NDA") meeting with the U.S. Food and Drug Administration ("FDA") and Chiasma, Roche terminated the deal, walking away from the $85 million it had already paid to Chiasma and any rights to Mycapssa. Quickly Chiasma publicly addressed the situation in order to assuage concerns Roche terminated the deal on account of the Phase 3 Trial results, stating:

> "The results of the Phase III trials were excellent, and a celebratory event was held in June to publicize them, attended by all Roche's senior executives, who were all happy and satisfied. We were with them [Roche] in all their meetings with the regulators, and we have before us all the results of the trials we conducted ourselves under their supervision. There is no problem with the results; what is apparently

> involved is a strategic decision by them whether or not to become more deeply involved in the endocrinology sector (hormone-based drugs)."

7. At the time of the IPO, aside from Mycapssa, Chiasma had no other products, approved or submitted for approval with the FDA from which the Company could expect to realize revenue in the United States in the immediate future. In fact, Chiasma publicly stated its plans for developing other drug indications was contingent on the FDA's approval of the Mycapssa NDA.

8. On July 6, 2015, approximately three weeks after it submitted the Mycapssa NDA to the FDA, Chiasma filed its Registration Statement on Form S-1/A. As is detailed herein (*see infra* §V), the Registration Statement, which Chiasma used to sell 7,319,750 shares of common stock for gross proceeds of approximately $106.5 million, included untrue statements of material facts and omitted material facts that made statements within the Registration Statement misleading. The untrue statements and omissions at issue center around Chiasma's purported ability to get Mycapssa approved using shorter development timelines and less capital, the misleading categorization of Mycapssa's Phase 3 Trial data, and the reasons Chiasma's former business partner left $85 million on the table and walked away from developing Mycapssa.

9. On April 15, 2016, after the close of trading, Chiasma announced that the FDA issued a Complete Response Letter ("CRL") regarding Chiasma's NDA for Mycapssa. The CRL indicated that the FDA's review of the NDA was complete and that Mycapssa was not ready for approval in its present form. Before the market opened on April 18, 2016, Chiasma issued another press release concerning the CRL in which the Company announced, among other things, that "[t]he FDA advised Chiasma that the Agency did not believe ***the company's application had provided substantial evidence of efficacy to warrant approval***, and advised Chiasma that it would need to conduct another clinical trial in order to overcome this deficiency."

10. The reaction by analysts and investors alike was swift and severe. Analysts quickly slashed or withdrew altogether their price targets for the Company's stock and downgraded the Company's stock rating. Investors fled from their Chiasma investment in droves.

11. Indeed, as the market learned the full extent of the truth, the price of Chiasma common stock ***plummeted more than 63% on April 18, 2016***, to close at just $3.75 per share, down from its closing price of $10.17 on April 15, 2016, the previous trading day. As of June 9, 2016, the date this action was brought, Chiasma common stock closed at $3.14 per share, ***down over 80% from its $16.00 IPO offering price***.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act (codified at 15 U.S.C. §§77k and 77o). This Court has jurisdiction of this action pursuant to §22 of the Securities Act (codified at 15 U.S.C. §77v) and 28 U.S.C. §1331.

13. Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District. Chiasma maintains its principal place of business in this District. Each of the Underwriter Defendants (defined herein) maintain offices in this District.

14. In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone and electronic communications, and the facilities of the national securities markets.

## III. PARTIES

15. Lead Plaintiff Laurent Sberro ("Lead Plaintiff" or "Sberro") purchased Chiasma common stock traceable to the IPO, and was damaged thereby. *See* Dkt. No. 16-2. The Court appointed Sberro, individually and as owner and authorized representative of Wetherby International, Inc. and Falcon Capital Management, Inc., Lead Plaintiff on December 27, 2016. *See* Dkt. No. 25.

16. Defendant Chiasma is a biopharmaceutical company incorporated in Delaware with its principal place of business in Newton, Massachusetts. Chiasma's stock trades on the NASDAQ under the ticker symbol "CHMA." Chiasma describes itself as "a late-stage biopharmaceutical

company focused on improving the lives of patients suffering from orphan diseases by developing and commercializing novel oral forms of therapies that are available today only by injection." At the time the Registration Statement became effective, the Company's lead product candidate was oral octreotide, or Mycapssa, for the treatment of acromegaly, a condition that results in the body's production of excess growth hormone.

17. Defendant Mark W. Leuchtenberger ("Leuchtenberger") was Chiasma's President and Chief Executive Officer ("CEO"), as well as a member of Chiasma's Board of Directors, at the time of the IPO and throughout the relevant time period. Effective October 1, 2016, Leuchtenberger was replaced as Chiasma's President, CEO, and as a director of the Company by Mark J. Fitzpatrick ("Fitzpatrick"), the Company's then-Chief Financial Officer ("CFO") and Treasurer. Leuchtenberger signed the Registration Statement on Forms S-1 and S-1/A.

18. Defendant Fitzpatrick was Chiasma's CFO and Treasurer at the time of the IPO and throughout the relevant time period. Fitzpatrick signed the Registration Statement on Forms S-1 and S-1/A. Effective October 1, 2016, Fitzpatrick became a director of Chiasma and replaced Leuchtenberger as Chiasma's President and CEO.

19. Defendant David Stack ("Stack") was a member of the Chiasma Board of Directors at the time of the IPO. Stack signed the Registration Statement on Forms S-1 and S-1/A. From 2005 through the date of the IPO, Stack was a Managing Director of MPM Capital, Inc. ("MPM Capital"), a venture capital fund focused on life sciences companies. The Registration Statement estimated MPM Capital's affiliates would beneficially own approximately 29.2% of Chiasma's common stock immediately following the IPO. In March 2013, using $55 million in proceeds from Chiasma's licensing agreement with Roche, Chiasma's directors approved the redemption of preferred shares

held by private investors, including affiliates of MPM Capital. Affiliates of MPM Capital received over $22.9 million in cash, and newly-authorized preferred shares, as part of this redemption.

20. Defendant Dror Brandwein ("Brandwein") was a member of the Chiasma Board of Directors at the time of the IPO. Brandwein signed the Registration Statement on Forms S-1 and S-1/A. Brandwein resigned from Chiasma's Board of Directors effective upon the closing of the IPO.

21. Defendant Todd Foley ("Foley") was a member of the Chiasma Board of Directors at the time of the IPO. Foley signed the Registration Statement on Forms S-1 and S-1/A. At the time of the IPO, Foley was a Managing Partner of MPM Capital, which he joined in 1999 and became a partner in 2007, as well as a member of MPM BioVentures IV LLC. In March 2013, using $55 million in proceeds from Chiasma's licensing agreement with Roche, Chiasma's directors approved the redemption of preferred shares held by private investors, including affiliates of MPM Capital. Affiliates of MPM Capital received over $22.9 million in cash, and newly-authorized preferred shares, as part of this redemption.

22. Defendant Ansbert Gadicke ("Gadicke") was a member of the Chiasma Board of Directors at the time of the IPO. Gadicke signed the Registration Statement on Forms S-1 and S-1/A. Gadicke resigned from Chiasma's Board of Directors effective November 3, 2016. Gadicke co-founded MPM Capital's venture investing activities in 1997; prior to that he led MPM Capital's Advisory and Investment Banking business from 1992 to 1996. Gadicke served as a Managing Director of MPM Asset Management LLC and a member of MPM BioVentures IV LLC at the time of the IPO. MPM Asset Management LLC is the Management Company of MPM BioVentures IV LLC. In March 2013, using $55 million in proceeds from Chiasma's licensing agreement with Roche, Chiasma's directors approved the redemption of preferred shares held by private investors,

including affiliates of MPM Capital. Affiliates of MPM Capital received over $22.9 million in cash, and newly-authorized preferred shares, as part of this redemption.

23. Defendant Bard Geesaman ("Geesaman") was a member of the Chiasma Board of Directors at the time of the IPO. Geesaman signed the Registration Statement on Forms S-1 and S-1/A. Geesaman served as a Managing Director at MPM Capital from January 2012 through the date of the IPO. Geesaman was also a Managing Director of MPM Asset Management LLC at the time of the IPO. In March 2013, using $55 million in proceeds from Chiasma's licensing agreement with Roche, Chiasma's directors approved the redemption of preferred shares held by private investors, including affiliates of MPM Capital. Affiliates of MPM Capital received over $22.9 million in cash and newly-authorized preferred shares as part of this redemption.

24. Defendant Vincent Miles ("Miles") was a member of the Chiasma Board of Directors at the time of the IPO. Miles signed the Registration Statement on Forms S-1 and S-1/A. Miles resigned from Chiasma's Board of Directors effective upon the closing of the IPO. From 2007 through the date of the IPO, Miles was a partner at Abingworth, a venture capital firm focused on life sciences and healthcare investment. The Registration Statement estimated Abingworth would beneficially own approximately 11.1% of Chiasma's common stock immediately following the IPO. In March 2013, using $55 million in proceeds from Chiasma's licensing agreement with Roche, Chiasma's directors approved the redemption of preferred shares held by private investors including Abingworth Bioventures V LP (an affiliated fund of Abingworth). Abingworth Bioventures V LP received over $21.4 million in cash, and newly-authorized preferred shares, as part of this redemption.

25. Defendant Scott Minick ("Minick") was a member of the Chiasma Board of Directors at the time of the IPO. Minick signed the Registration Statement on Forms S-1 and S-1/A. From

1998 to 2010, Minick was Managing Director of ARCH Venture Partners ("ARCH") and, according to the Registration Statement, "was instrumental in the startup, development and financing of . . . ARCH portfolio companies," including Chiasma. Minick was a venture partner of ARCH at the time of the IPO. The Registration Statement estimated the ARCH Venture Fund IV, L.P. (an affiliated fund of ARCH) would beneficially own approximately 5.7% of Chiasma's common stock immediately following the IPO. In March 2013, using $55 million in proceeds from Chiasma's licensing agreement with Roche, Chiasma's directors approved the redemption of preferred shares held by private investors including ARCH Venture Fund VI, L.P. ARCH Venture Fund VI, L.P. received over $1 million in cash, and newly-authorized preferred shares, as part of this redemption.

26. Defendant John Scarlett ("Scarlett") was a member of the Chiasma Board of Directors at the time of the IPO. Scarlett signed the Registration Statement on Forms S-1 and S-1/A.

27. The defendants referenced above in ¶¶17-26 may be referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement, thus making them liable under §11 of the Securities Act for actionable statements in and omissions from the Registration Statement. Additionally, the Individual Defendants were each control persons of Chiasma who were culpable participants in the violations of §11 of the Securities Act, thus making them liable under §15 of the Securities Act.

28. Defendant Barclays Capital Inc. ("Barclays") is an investment banking and research firm that acted as an underwriter and joint book-running manager of the IPO. Barclays is a wholly-owned subsidiary of Barclays Bank PLC. Barclays' equity research department initiated equity research coverage of Chiasma on August 10, 2015, with a price target of $40.00 and a stock rating of "overweight."

29. Defendant Cowen and Company, LLC ("Cowen") is an investment banking and research firm that acted as an underwriter and joint book-running manager of the IPO. Cowen's

equity research department initiated equity research coverage of Chiasma on August 10, 2015, with a price target of $43.00 and a stock rating of "outperform."

30. Defendant William Blair & Company, L.L.C. ("William Blair") is an investment banking and research firm that acted as an underwriter of the IPO. William Blair's equity research department initiated equity research coverage of Chiasma on August 10, 2015, with a price target of $40.00 and a stock rating of "outperform."

31. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is an investment banking and research firm that acted as an underwriter of the IPO. Oppenheimer's equity research department initiated equity research coverage of Chiasma on August 10, 2015, with a price target of $43.00 and a stock rating of "outperform."

32. The defendants referenced above in ¶¶28-31 are referred to herein as the "Underwriter Defendants." Defendant Chiasma, the Individual Defendants and the Underwriter Defendants may be collectively referred to herein as the "Defendants."

33. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements and omissions in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO in exchange for substantial fees. Prior to the IPO, certain of the Underwriter Defendants, and representatives from Chiasma, met with potential investors and presented highly favorable information about the Company, its operations, and Mycapssa;

(b) The Underwriter Defendants obtained an agreement from Chiasma that Chiasma would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws;

(c) Representatives of the Underwriter Defendants also assisted Chiasma and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable

investigation into the business and operations of Chiasma, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had the opportunity to obtain access to confidential corporate information concerning Chiasma's operations and financial prospects; and

(d) The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective.

## IV. BACKGROUND

### A. The FDA Regulatory Regime

34. The Federal Food, Drug & Cosmetic Act, enacted in 1938 (as amended, the "Act") created the FDA, an agency of the U.S. Department of Health and Human Services, and required the FDA to "protect the public health" by ensuring that "drugs are safe and effective." 21 U.S.C. §393(b)(2)(B). The Act provides that "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [this section] is effective with respect to such drug." 21 U.S.C. §355(a).

35. Every new pharmaceutical drug commercially distributed in the U.S. must first receive approval by the FDA for sale and marketing. The FDA's NDA process is the vehicle through which drug sponsors propose new drugs to the FDA. According to the FDA, the NDA is designed to provide FDA reviewers with sufficient information to reach the following key decisions: (i) "[w]hether the drug is safe and effective in its proposed use(s)" (21 U.S.C. §393(b)(2)(B); (ii) "whether the benefits of the drug outweigh the risks" (21 U.S.C. §355-1(a)(1)); (iii) "[w]hether the drug's proposed labeling (package insert) is appropriate, and what it should contain" (21 U.S.C. §355(b)(1) ("505(b)(1)")(F)); and (iv) "[w]hether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity" (505(b)(1)(D) and 21 C.F.R. §314.50(d)(1)(i)).

36. The Act, as amended, requires the Commissioner of the FDA to refuse any drug application if (a) "he has insufficient information to determine whether such drug is safe for use

under such conditions;" or (b) "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. §355(d)(4)-(5).

37. There are three regulatory pathways to obtaining new drug approval pursuant to the Act: (i) a full NDA pursuant to 505(b)(1) that relies on studies conducted by or for the applicant; (ii) an abbreviated new drug application pursuant to 21 U.S.C. §355(j) ("ANDA") for versions of a drug that are identical to previously-approved drugs; or (iii) an intermediate process pursuant to 21 U.S.C. §355(b)(2) ("505(b)(2)").

38. A person seeking approval of a new drug pursuant to 505(b)(1) must submit to the FDA "full reports of investigations which have been made to show whether or not [the] drug is safe for use and whether [the] drug is effective in use." 21 U.S.C. §355(b)(1)(A). The full NDA process thus requires the sponsor to submit detailed safety and efficacy data for the drug, including, among other things, full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use (*i.e.*, clinical trials); all components of the drug; the methods used for the drug's manufacture, processing, and packing; and examples for proposed labeling for the drug. This path is used by sponsors for new branded drugs, which are sometimes called "pioneer" or "innovator" drugs.

39. A company seeking to market a version of a drug that is identical to a previously-approved drug may file an ANDA. The ANDA process facilitates efficient approval of generic versions of pioneer drug products that have already been determined to be safe and effective. Rather than requiring generic sponsors to conduct expensive and time consuming clinical trials, the ANDA process allows the sponsors to rely on the clinical trials already performed in connection with the approval of the previously-approved drug, provided that the generic sponsor can show that its drug has the same relevant characteristics (including, *inter alia*, the same labeling, active ingredient, route of administration, dosage form, strength, and bioequivalency). In other words, an ANDA does not attempt to demonstrate safety or effectiveness; instead, the sponsor's only goal is to establish that the generic product is equivalent to another drug that is already known to be safe and effective. Thus,

this path is used by sponsors for the introduction of generic versions of previously-approved branded drugs.

40. The 505(b)(2) NDA pathway is a hybrid of the other two pathways. Like the full NDA, a 505(b)(2) NDA must directly demonstrate that the proposed drug product is safe and effective; however, like the ANDA, a 505(b)(2) sponsor can rely (in part) on clinical studies that were previously submitted to the FDA in support of another drug and that were not conducted or licensed by the 505(b)(2) applicant. The drug for which the borrowed studies were conducted is referred to as the "Reference Listed Drug" ("RLD"). A 505(b)(2) NDA may include the applicant's own research supporting the safety and efficacy of the drug in addition to the research studies related to the RLD or it may rely entirely on the RLD. In any event, the 505(b)(2) sponsor must present information that bears upon the safety and effectiveness of its drug product in light of the difference between the RLD and the sponsor's modification of that drug product. *See* 21 C.F.R. §314.54(a) (providing that 505(b)(2) applications must provide data that supports any modification of the drug from the relied upon NDA).

41. The FDA will "accept" all NDA submissions for filing ***before any substantive review is performed*** so long as every component of the NDA is included. 21 C.F.R. §314.101(d)(1). The regulations in 21 C.F.R. §§314.50 and 314.94 describe the required components of an application.

42. The FDA's ultimate approval of a drug requires, *inter alia*, the FDA's acceptance of extensive clinical studies (testing on humans) and non-clinical studies (testing on animals and in labs). Clinical testing is typically done in three phases that are codified in FDA regulations:

(a) <u>Phase 1</u>. Phase 1 studies "are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness."

(b) <u>Phase 2</u>. Phase 2 studies are "typically well controlled" studies "conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug."

(c) Phase 3. Phase 3 studies are expanded studies "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. Phase 3 studies usually include from several hundred to several thousand subjects." 21 C.F.R. §312.21.

43. Each phase of clinical testing attempts to gather more information on drug safety and efficacy in human subjects, and each phase requires an increase in the population size. Generally speaking, while Phase 1 studies typically focus on dose tolerance of a drug, Phase 2 studies focus both on dose tolerance and efficacy. Phase 3 studies focus on efficacy and safety. Chiasma only conducted Mycapssa Phase 1 and 3 Trials for the treatment of acromegaly.

44. Within 60 days of receiving an NDA, the FDA will accept the NDA for filing if it believes the NDA contains all components necessary to permit a substantive review of the information contained within the NDA. ***The acceptance of an NDA for filing is not a determination of the substantive merits of the NDA, but rather a threshold determination of whether there is enough data to conduct a substantive examination***.

45. The filing of an NDA triggers review deadlines specified in the Prescription Drug User Fee Act ("PDUFA"). Under the PDUFA, the FDA is generally required to respond to the NDA within six months. The date by which the FDA must issue its response is frequently referred to as a drug's "PDUFA date."

46. If the FDA approves the drug candidate, it will issue an approval letter in writing to the applicant. If the FDA finds that the NDA fails to provide the substantial evidence of efficacy and safety required by statute, or has other material shortcomings which prevent approval, the FDA will send the sponsor a CRL identifying the reasons why the application was not approved.

**B. Background on Chiasma's Development of Mycapssa**

47. Chiasma commenced operations in 2001 and has focused its efforts on raising capital and developing Mycapssa for the treatment of acromegaly, including undertaking non-clinical studies and conducting clinical trials. Mycapssa is the only drug candidate for which Chiasma has

conducted clinical trials. According to the Registration Statement, the worldwide market for injectable somatostatin analogs is approximately $2.0 billion annually, of which approximately $730 million represents annual sales for the treatment of acromegaly.

48. Acromegaly is a rare and serious hormonal growth disorder that results in the body's production of excess growth hormone ("GH"). Acromegaly can be caused by a benign tumor of the pituitary gland that releases excess GH, which in turn elevates insulin-like growth factor 1 ("IGF-1"). Although initial symptoms typically include overgrowth of the hands and feet, there may also be enlargement of the forehead, jaw and nose. Acromegaly can also affect internal organs and joints and cause joint pain, thicker skin, deepening of the voice, headaches, and problems with vision. Untreated, acromegaly can lead to serious illness and premature death.

49. There is no known cure for acromegaly. Treatment focuses on reversing or ameliorating symptoms. The current standard of care is to use somatostatin analogs, which are synthetic forms of a hormone, somatostatin, that inhibit growth hormone production. Somatostatin is a peptide hormone secreted from the liver that controls growth hormone levels. When the body senses too much growth hormone, somatostatin inhibits the release of GH, resulting in normal growth. Analogs have been developed that mimic natural somatostatin, including octreotide.

50. Patients diagnosed with acromegaly typically undergo lifelong, once-monthly injections of an extended release somatostatin analog. These products contain a viscous formulation and are typically administered by a healthcare professional with large-gauge needles into the muscle or deeply under the skin. While injectable somatostatin analogs are generally effective at reducing GH and IGF-1 levels, the injections are associated with significant limitations and patient burdens.

51. There are currently no FDA-approved oral formulations of octreotide. Instead, commercially-available octreotide products include long-acting and short-acting injections. A long-acting octreotide injection is given about once a month, and patients may supplement those injections with short-acting octreotide injections up to three times per day towards the end of the monthly cycle to maintain adequate levels in the bloodstream.

52. Mycapssa capsules are an oral formulation of an octreotide. The RLD that the Mycapssa NDA submission referred to is the "short-acting subcutaneous injectable formulation of octreotide," which the FDA had previously approved. Had it been approved by the FDA in April 2016, Mycapssa would have been the first oral somatostatin analog approved for acromegaly in the U.S.

53. Chiasma developed a suspension formulation called TPE to enhance intestinal absorption by temporarily increasing small intestinal permeability of peptides. The TPE platform is proprietary to Chiasma. Chiasma's intent was to use its TPE delivery system to make other injectable drugs available for oral consumption.

54. Chiasma publicly stated TPE would allow the Company to develop a deep pipeline of drugs in a short timeframe and at reduced costs. For instance, Leuchtenberger stated during a November 18, 2015 conference call:

> [W]e believe, [TPE] will enable us to select from promising commercial products and develop a pipeline of oral peptide candidates in the future. That, because we are targeting successful products, ***will lead to faster development time, shorter time to approval, and reduced expense***.

55. At the time of the IPO, Mycapssa was the first and only drug developed using Chiasma's TPE platform that was tested in a Phase 3 level trial. Chiasma did not perform a Mycapssa Phase 2 Trial, going instead straight from Phase 1 to Phase 3. Chiasma had no other products, approved or submitted for approval with the FDA, from which the Company could expect to realize revenue in the United States in the immediate future.

56. In addition, Chiasma publicly stated its plans for developing other drug indications were contingent on the FDA's approval of the Mycapssa NDA. For example, the Company stated it would submit an investigational NDA and initiate a Phase 2 clinical trial of oral octreotide for the treatment of neuroendocrine tumors ("NET") in the second half of 2016 if the NDA for Mycapssa was approved in April 2016.

57. Following the IPO, the Underwriter Defendants' equity research departments also emphasized that Chiasma would use its TPE technology to develop drugs and seek regulatory approval of those drugs via the FDA's "relatively de-risked" 505(b)(2) pathway.

58. For example, on August 10, 2015, Barclays' research department reported Chiasma "intends to leverage the 505(b)(2) pathway which offers ***faster approval***," adding "***[t]here is no shortage of candidates in which the TPE technology can be applied***." This same report emphasized Chiasma "leverages [its TPE] technology . . . enabling the use of the 505(b)(2) pathway, which offers ***shorter development timelines and lower risk***."

59. In another report dated August 10, 2015, Cowen's research department explained Chiasma is "taking advantage of pathways to approval that lead to ***shorter development timelines and lower associated expenses***."

60. An August 10, 2015 report by Oppenheimer's research department described TPE as an "[a]ttractive technology platform to generate ***pipeline of similar de-risked IV-to-oral, market-conversion, 505(b)(2)-eligible oral-peptide therapeutics***."

61. On September 1, 2015, Oppenheimer's research department published another report stating "[i]n [its] view, approval and commercial launch of Mycapssa in the US carry ***relatively low risk, as the company is using the relatively de-risked 505(b)(2) regulatory pathway for approval***."

## C. Clinical Studies of Mycapssa

### 1. Phase 1 Clinical Trials

62. In 2010, Chiasma began conducting Mycapssa clinical trials. Chiasma conducted a series of Phase 1 clinical trials in order to demonstrate that the bioavailability of octreotide administered in the TPE formulation was comparable to the bioavailability of octreotide administered in the short-acting subcutaneous formulation. In 2011, Chiasma conducted four crossover open-label Phase 1 clinical trials in Tel Aviv, Israel and Lincoln, Nebraska using 75 healthy volunteers. These trials purportedly revealed a dose-dependent pharmacokinetics profile for Mycapssa, as well as a significant pharmacodynamics effect measured as reduced growth hormone secretion compared to baseline. Plasma concentrations of Octreolin loaded with 20 mg of octreotide

were purportedly comparable to 0.1 mg subcutaneous octreotide, indicating a relative oral bioavailability of 0.5%.

63. According to the Company's Registration Statement, a total of 11 clinical pharmacology studies have evaluated the safety of Mycapssa. In all of these studies, the Registration Statement claims, the safety profile of Mycapssa was consistent with the known safety profile of the short-acting octreotide 0.1 mg short-acting subcutaneous injection. In its Registration Statement, Chiasma claims that no new or unexpected safety issues were detected during any of the clinical pharmacology studies, and that no new safety issues related to the novel formulation or route of administration were observed.

**2. Phase 3 Clinical Trial**

64. Between March 2012 and November 2014, Chiasma conducted what is described as a single-arm, open label, multi-center, baseline-controlled Phase 3 Trial in order to determine whether subjects with acromegaly were able to maintain safe and effective responses to treatment when switched from long-acting injectable octreotide to Mycapssa. A single-arm trial is a trial in which every patient enrolled receives new medicine, as opposed to including a separate arm (or group) of patients given a placebo or another medicine to allow comparison. An open-label trial is a trial in which both the researchers and participants know the treatment is being administered, as opposed to a double-blind study in which neither the researchers nor the participants know which patients are receiving a particular treatment. The Phase 3 Trial did not include testing sites in the U.S. because the FDA wanted six months of monkey toxicity data and the Company at that time only had three months of data.

65. The Phase 3 Trial purportedly sought to evaluate the safety and efficacy of Mycapssa in patients with acromegaly after seven months of treatment ("Core Treatment Phase") as well as after an optional six-month extension phase ("Extension Phase").

66. The Registration Statement described the Phase 3 "Trial Design" as follows:

*Trial Design*

A total of 155 patients with acromegaly, each of whom was classified as a responder to a long-acting injectable somatostatin analog, were enrolled in the trial. Two weeks after their last monthly injection of the long-acting injectable somatostatin analog, patients were reassessed to obtain baseline IGF-1 and GH levels. Both the screening and baseline measurements were performed while patients were still on active injection therapy. The 155 patients enrolled in the trial are referred to as the intent to treat, or ITT, group.

After baseline levels were obtained, no less than one month following their last monthly injection of the long-acting injectable somatostatin analog, a core treatment period with oral octreotide was initiated. This core treatment period consisted of a dose-escalation phase of at least two months in duration, designed to find an appropriate dose of oral octreotide for each individual patient, and a fixed-dose phase of up to five months in duration, during which period the appropriate therapeutic dose identified in the dose-escalation phase was maintained. Since data from our prior clinical trials demonstrated a significant reduction in bioavailability when oral octreotide is administered with a high-fat meal, patients in this Phase 3 clinical trial were required to fast for at least one hour before and at least one to two hours after each dose.

Patients who entered the core treatment phase of the trial initially received a 40 mg daily dose (administered in two pills a day), which was increased to daily doses of 60 mg or 80 mg on an as-required basis to maintain biochemical and/or symptom control, at the discretion of the investigator. For each patient, the core treatment phase lasted for seven months after his or her first dose of oral octreotide. Patients could then opt to continue treatment with oral octreotide during an extension period of up to an additional six months, with a two-week period for final follow-up. Four patients dropped out of the trial after receiving at least one dose of oral octreotide but before a biochemical response could be measured, resulting in a modified intent to treat, or mITT, group of 151 patients.

The primary objective of the trial was to determine the efficacy of oral octreotide in patients with acromegaly, as measured by effect on IGF-1 and GH levels, with responders defined as patients who achieve an IGF-1 level less than 1.3 times the upper limit of normal, or ULN, adjusted for age and an integrated GH level over two hours less than 2.5 ng/mL. Secondary objectives included assessment of safety and tolerability of oral octreotide, and comparison of efficacy of oral octreotide versus long-acting injectable somatostatin analog.

**Phase 3 Clinical Trial Design**




67. The Registration Statement also described the purported Phase 3 "Trial Results" as follows:

*Trial Results*

Of the 155 patients enrolled, four were not evaluable and of the 151 in the mITT group, 49 patients discontinued, the majority during the dose-escalation phase. Of the 151 patients in the mITT group, patients discontinued for a variety of reasons, including treatment failures because the patient could not be controlled on 80 mg, the highest dose available (24); withdrawals due to adverse events (18); or patient choice, sponsor request and lost to follow up (7). Of the 110 patients that completed the dose-escalation phase, 52 patients, or 47%, were receiving the 40 mg daily dose, 25 patients, or 23%, were receiving the 60 mg dose, and 33 patients, or 30%, were receiving the 80 mg dose.

After completion of the dose-escalation phase, the remaining 110 patients entered the fixed dose phase of the core treatment period and continued on oral octreotide at their respective doses until seven months after first dosing. A total of 102 patients completed the fixed dose phase of the trial, 88 of whom, or 86%, voluntarily chose to remain on oral octreotide during the six-month extension phase, for a total of 13 months of treatment after first dosing. A total of 82 patients completed the six-month extension phase of the trial.

Overall, 65% of patients in the mITT group were classified as responders at the end of the seven-month core treatment phase, which was the primary endpoint for the trial. Applying a worst-case imputation method, whereby all patients who withdrew from the study prematurely (regardless of reason) are treated as non-responders, 53% of patients were classified as responders at the end of the seven-month core treatment phase. By the end of the six-month extension phase, or 13 months after first dosing, the responder rate was 62% in the mITT group. Of the 110 patients that completed the dose-escalation phase, and therefore received an optimized dose of oral octreotide, 75% were classified as responders. For all 151 patients included in the mITT group, the responder rate on long-acting injectable somatostatin analogs was 89% at baseline, prior to initiation of oral octreotide.

**Overall Phase 3 Response in mITT Group vs. Baseline**




> We further assessed the quality of the responses to oral octreotide. The quality of the patient responses on oral octreotide was comparable to the quality of the responses on injectable therapies. In the mITT group, mean GH levels on oral octreotide therapy were below the baseline values on injectable therapies at all timepoints assessed through the end of the extension phase. The median GH level in the mITT group at baseline was 0.77 ng/mL, which dropped to 0.40 ng/mL within two hours of the first dose of oral octreotide and 0.49 ng/mL by the end of the extension phase, 13 months later. IGF-1 levels were stably maintained below 1.3 times the ULN for up to 13 months in the mITT group.

68. With respect to the "patients [that] discontinued for a variety of reasons," the Registration Statement did not specify the number of days/weeks/months into the study each of those patients proceeded before discontinuing.

**D. Chiasma's Short-Lived Agreement with Roche to Develop and Commercialize Mycapssa**

69. In December 2012, Chiasma signed a licensing agreement with Roche to develop and commercialize Mycapssa ("Roche Licensing Agreement"). Roche is a Swiss multi-national health-care company that is one of the largest pharmaceutical companies in the world.

70. According to the Registration Statement, under the terms of the Roche Licensing Agreement, which became effective in January 2013, Chiasma agreed to continue clinical development through completion of the Phase 3 Trial, establish commercial-scale manufacturing, and complete ongoing non-clinical activities. Roche assumed responsibility for the development and commercialization of Mycapssa thereafter.

71. The Roche Licensing Agreement provided for an upfront payment of $65 million to Chiasma, future consideration of up to ***$530 million*** in development and commercial milestones, and the right to receive tiered, double-digit royalties on net sales of Mycapssa.

72. In March 2013, Chiasma's board of directors voted to use 85% of the $65 million upfront payment from Roche to redeem Chiasma preferred shares held by directors, officers, and others. The Company paid out $55 million in cash, as well as new preferred shares as part of the redemption. Many of the directors and their affiliated venture funds prospered from this redemption, including Abingworth Bioventures V LP (which received over $21.4 million in cash), affiliates of MPM Capital (over $22.9 million), and ARCH Venture Fund VI, L.P. (over $1 million). *See* ¶¶19, 21-25.

73. According to the Registration Statement, during the year ended December 31, 2013, Chiasma received $75 million from Roche related to the Roche License Agreement, which included the upfront payment of $65 million and a first milestone payment of $10 million. In 2014, Chiasma received an additional $10 million related to a second milestone payment, bringing the total payments from Roche to $85 million.

74. In April 2014, Chiasma entered into an additional agreement with Roche pursuant to which Chiasma would receive an additional aggregate amount of $2.7 million, payable in three installments, covering certain development costs incurred by Chiasma. In May 2014, with seven months of data from the Core Treatment Phase of the Phase 3 Trial in hand, Roche and Chiasma conducted a pre-NDA meeting with the FDA. Two months later, in July 2014, Roche terminated the Roche Licensing Agreement, walking away from ***the more than $85 million*** it had already paid Chiasma as well as any upside from the FDA's potential approval of Mycapssa.

75. Shortly after Roche's announcement that it terminated the Roche Licensing Agreement, Chiasma's then-CEO Roni Mamluk publicly issued statements explaining the reasons Roche terminated the deal. Mamluk served as Chiasma's CEO and director of the Board from April 2013 to March 2015. Mamluk was also Chiasma's Chief Operating Officer and Vice President of Research and Development from 2006 to April 2013, and the Company's Chief Development

Officer at the time of the IPO and throughout the relevant time period. Specifically, on August 6, 2014, an article by *Globes* reported Mamluk as having made the following statement:

> "***The results of the Phase III trials were excellent, and a celebratory event was held in June to publicize them, attended by all Roche's senior executives, who were all happy and satisfied***. We were with them [Roche] in all their meetings with the regulators, and we have before us all the results of the trials we conducted ourselves under their supervision. ***There is no problem with the results; what is apparently involved is a strategic decision by them whether or not to become more deeply involved in the endocrinology sector*** (hormone-based drugs)."

76. News media outlets repeatedly referenced Mamluk's August 2014 statement regarding Roche's termination of the deal. For instance, *TendersInfo* publicly reported on December 31, 2014: "investors continue to believe in [Chiasma's] product, and say that Roche's reasons for scrapping the deal were related to its strategic concerns, and was ***not concerned with with [sic] the product's quality or the market size and expected profit from it***." On January 2, 2015, *FierceBiotech* specifically referenced the August 6, 2014, *Globes* article, and Mamluk's message that (paraphrasing) "octreotide's Phase III results were 'excellent' and that Roche's decision reflects its unwillingness to dive into endocrinology, ***not a problem with the acromegaly treatment***." After the IPO, on July 22, 2015, *FierceBiotech* reported: "While Roche evidently saw insufficient reasons to keep working with Chiasma as the acromegaly drug at the center of their alliance neared commercialization, ***investors have taken a different stance***."

**E. Chiasma and the FDA Met Prior to the Mycapssa NDA Submission**

77. In October 2014, the Company completed its analysis of the Phase 3 Trial data, following which, in December 2014, the Company held a pre-NDA meeting with the FDA. On June 15, 2015, Chiasma submitted its 505(b)(2) NDA to the FDA for Mycapssa. The FDA set a target PDUFA date of April 15, 2016. According to Defendants, the NDA (which is not a publicly-available document) was over 1,000 pages in length.

78. Chiasma filed the NDA under the FDA's 505(b)(2) pathway for regulatory approval. According to the Registration Statement, Chiasma based its application in large part on data from the Phase 3 Trial. The NDA also relied in part on the FDA's prior findings of safety and efficacy for the

short-acting subcutaneous injectable formulation of octreotide. This formulation of octreotide was already approved by the FDA.

**F. 505(b)(2) Approval Pathway**

79. As discussed above, one of the three regulatory pathways to obtaining approval of new drugs pursuant to the Act is the 505(b)(2) pathway. An NDA submitted under this pathway references a previously-approved product – the RDL – and relies in part on studies that were not conducted by or for the applicant. Accordingly, a 505(b)(2) applicant will not rely solely on its own investigations and studies into the proposed drug's safety and efficacy in seeking FDA approval of the applicant's drug. An applicant may rely on such prior findings so long as various FDA regulatory requirements are met, such as the applicant certifies that patents will not prohibit the manufacture, use, or sale of the drug. Importantly, the 505(b)(2) sponsor must present information that bears upon the safety and effectiveness of its drug product in light of the difference between the RDL and the sponsor's modification of that drug product. *See* 21 C.F.R. §314.54(a) (providing that 505(b)(2) applications must provide data that supports any modification of the drug from the relied upon NDA).

80. Chiasma's ability to obtain approval from the FDA under the 505(b)(2) pathway was important to Chiasma's business model and investors. Chiasma's business model was to take a previously-approved injectable drug and, using Chiasma's TPE technology, develop that drug into an oral form and submit an application for approval in the U.S. using the 505(b)(2) pathway. According to the Registration Statement, Chiasma focused its "efforts on drugs for which [it] may utilize the FDA's 505(b)(2) regulatory pathway."

81. According to the Registration Statement, this pathway permitted Chiasma to bring drugs to the market faster and cheaper than if Chiasma had proceeded under a pathway in which it was not entitled to rely on previous findings or studies, such as through a 505(b)(1) application. For example, according to the Registration Statement, "[t]he 505(b)(2) pathway enables a potentially shorter development timeline compared to the development time for drugs that are new chemical

entities by allowing us to rely, in part, on the FDA's prior findings of safety and efficacy for a previously-approved product, or published literature, in support of our NDA."

82. Upon initiating coverage of Chiasma, the Underwriter Defendants' equity research departments promptly emphasized that Chiasma would develop and seek regulatory approval of drugs via the FDA's 505(b)(2) pathway. For example, on August 10, 2015, Barclays' research department reported Chiasma "intends to leverage the 505(b)(2) pathway which offers faster approval," adding "[t]here is no shortage of candidates in which the TPE technology can be applied." This same report emphasized Chiasma "leverages [its TPE] technology . . . enabling the use of the 505(b)(2) pathway, which offers shorter development timelines and lower risk." In another report dated August 10, 2015, Cowen's research department explained Chiasma is "taking advantage of pathways to approval that lead to shorter development timelines and lower associated expenses." An August 10, 2015, report by Oppenheimer's research department described TPE as an "[a]ttractive technology platform to generate pipeline of similar de-risked IV-to-oral, market-conversion, 505(b)(2)-eligible oral-peptide therapeutics."

**G. Chiasma's IPO**

83. On April 17, 2015, Chiasma submitted its draft Registration Statement on Form S-1 to the SEC, which included a preliminary prospectus.

84. Soon after Chiasma filed its preliminary prospectus with the SEC, a slide presentation was created for use in Chiasma's presentations with potential IPO investors. The slide presentation constituted a "written communication" under Rule 405, and a "prospectus" under Rules 2(10) and 12(a)(2), of the Securities Act. The slide presentation provided details of the upcoming IPO and touted the benefits of an investment in Chiasma. For example, a slide titled "Chiasma Investment Highlights" stated Chiasma's TPE technology was "[c]linically validated" and "enables pipeline of high value oral peptide candidates." The same slide also stated Chiasma was "[l]everaging 505(b)(2) pathway [which] allows shorter development timelines and lower development and regulatory risk." Another slide stated "Patients [Were] Controlled and Responses [Were] Sustained on Oral Octreotide." Another slide titled "Oral Octreotide – Positive Phase 3 Results" stated "[o]ral

octreotide achieved disease control in the majority of patients (65% vs. 89% on injections)" and that "[e]fficacy [was] sustained through the end of treatment (13 months)." Another slide titled "Clear Regulatory Pathway for Acromegaly in U.S." assured investors that "[b]ased upon December 2014 [m]eeting with FDA . . . FDA indicated no issue that would preclude submission of a NDA for review."

85. On July 6, 2015, approximately three weeks after it submitted the Mycapssa NDA to the FDA, Chiasma filed its Registration Statement on Form S-1/A. On July 15, 2015, the SEC declared the Registration Statement effective. On or about July 15, 2015, Chiasma completed its IPO, issuing 6,365,000 shares and raising net proceeds of approximately $101,840,000. As part of the underwriting agreement, the Underwriter Defendants exercised their option to purchase an additional 954,750 shares of common stock as part of the offering. According to the Company's 2015 Form 10-K, on July 21, 2015, Chiasma completed the sale of 7,319,750 shares of common stock in its IPO, resulting in net proceeds of approximately $106.5 million.

86. Barclays and Cowen acted as joint book-running managers for the offering. William Blair and Oppenheimer acted as co-managers.

### H. The FDA Rejects Chiasma's NDA as Submitted

87. After the market closed on April 15, 2016, Chiasma announced that the FDA issued Chiasma a CRL stating the Mycapssa NDA "is not ready for approval in its present form." The Company stated it would provide an update on Monday, April 18, 2016.

88. On April 18, 2016, the Company reported that "the FDA advised Chiasma that the Agency did not believe the company's application had provided substantial evidence of efficacy to warrant approval, and advised Chiasma that it would need to conduct another clinical trial in order to overcome this deficiency."

89. Specifically, the Company confirmed that "[t]he FDA expressed concerns regarding certain aspects of the company's single-arm, open-label Phase 3 clinical trial and strongly recommended that the company conduct a randomized, double-blind and controlled trial that enrolls

patients from the United States and be of sufficiently long duration to ensure that control of disease activity is stable at the time point selected for the primary efficacy assessment."

90. The Company also disclosed that the FDA "conveyed to the representative of one of Chiasma's suppliers" that "during a recent site inspection, certain deficiencies [existed] that would need to be resolved before approval."

91. On December 21, 2016, the FDA sent Chiasma a warning letter ("December 21, 2016 Warning Letter") regarding a video Chiasma posted on the website YouTube.com entitled "Experts Discuss New Advances in Acromegaly." According to the December 21, 2016 Warning Letter, the video suggested that Mycapssa is "safe and effective for the purpose for which it is being investigated or otherwise promotes the drug." The December 21, 2016 Warning Letter stated that "octreotide capsules is misbranded under section 502(f)(1) of the [Act, and] section 301(a) of the [Act]," which prohibits the distribution of a misbranded product into interstate commerce. The FDA warned that "the extensive claims and presentations throughout the majority of this video . . . suggest in a promotional context that octreotide capsules, an investigational new drug, is safe or effective for such uses, when FDA has not approved octreotide capsules for any use."

## V. FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. The Phase 3 "Trial Results" Were Presented in a Materially Misleading Manner

92. In discussing the Phase 3 Trial results, the Registration Statement focused on the Phase 3 Trial patients' response rates, comparing responders at the time of baseline injections to Mycapssa responders. Chiasma's statements concerning the response rates were materially misleading and failed to disclose important statistical information regarding the response rates and the FDA's concerns over whether those rates were actually reflective of Mycapssa's efficacy. The response rates, *inter alia*, were not calculated in a stratified analysis which would demonstrate the level of response based on the number of patients completing the study at various times of their participation.

93. The Company's Phase 3 clinical data was listed in the Registration Statement as one of Chiasma's "Competitive Strengths." The Registration Statement misleadingly stated, "***[b]ased on our clinical data and feedback from patients and healthcare providers, we believe oral octreotide has the potential to become a standard of care in the treatment of acromegaly***."

94. The Registration Statement also included the following false and misleading descriptions of the Phase 3 Trial results:

> *Trial Results*
>
> Of the 155 patients enrolled, four were not evaluable and of the 151 in the mITT group, 49 patients discontinued, the majority during the dose-escalation phase. Of the 151 patients in the mITT group, patients discontinued for a variety of reasons, including treatment failures because the patient could not be controlled on 80 mg, the highest dose available (24); withdrawals due to adverse events (18); or patient choice, sponsor request and lost to follow up (7). Of the 110 patients that completed the dose-escalation phase, 52 patients, or 47%, were receiving the 40 mg daily dose, 25 patients, or 23%, were receiving the 60 mg dose, and 33 patients, or 30%, were receiving the 80 mg dose.
>
> After completion of the dose-escalation phase, the remaining 110 patients entered the fixed dose phase of the core treatment period and continued on oral octreotide at their respective doses until seven months after first dosing. A total of 102 patients completed the fixed dose phase of the trial, 88 of whom, or 86%, voluntarily chose to remain on oral octreotide during the six-month extension phase, for a total of 13 months of treatment after first dosing. A total of 82 patients completed the six-month extension phase of the trial.
>
> Overall, 65% of patients in the mITT group were classified as responders at the end of the seven-month core treatment phase, which was the primary endpoint for the trial. Applying a worst-case imputation method, whereby all patients who withdrew from the study prematurely (regardless of reason) are treated as non-responders, 53% of patients were classified as responders at the end of the seven-month core treatment phase. By the end of the six-month extension phase, or 13 months after first dosing, the responder rate was 62% in the mITT group. Of the 110 patients that completed the dose-escalation phase, and therefore received an optimized dose of oral octreotide, 75% were classified as responders. For all 151 patients included in the mITT group, the responder rate on long-acting injectable somatostatin analogs was 89% at baseline, prior to initiation of oral octreotide.

**Overall Phase 3 Response in mITT Group vs. Baseline**




> We further assessed the quality of the responses to oral octreotide. The quality of the patient responses on oral octreotide was comparable to the quality of the responses on injectable therapies. In the mITT group, mean GH levels on oral octreotide therapy were below the baseline values on injectable therapies at all timepoints assessed through the end of the extension phase. The median GH level in the mITT group at baseline was 0.77 ng/mL, which dropped to 0.40 ng/mL within two hours of the first dose of oral octreotide and 0.49 ng/mL by the end of the extension phase, 13 months later. IGF-1 levels were stably maintained below 1.3 times the ULN for up to 13 months in the mITT group.

95. The Registration Statement misleadingly failed to explain that the response rates and GH levels referenced in ¶94 were calculated using a last observation carried forward ("LOCF") method, or how this method affected the rates emphasized in ¶94. Under the LOCF method, in the event a Phase 3 study patient withdrew from the study prior to reaching the end of the treatment period (*e.g.*, the seven-month Core Treatment Phase or the sixth-month Extension Phase), that patient's last observed IGF-1 and GH levels would be "carried forward" to the end of the treatment period, ***as if he/she had actually completed that treatment period***. 59 patients – about 38% of the 155 that enrolled – terminated the Phase 3 study early. The patients who terminated the study early nonetheless were included in these response rates, inflating the rate of "responders" to Mycapssa.

96. The Registration Statement was also materially misleading for failing to disclose that the FDA-requested worst observation carried forward ("WOCF") method yielded different response rates. The WOCF method yields significantly lower response rates than the rates Chiasma reported in the Registration Statement. For example, under the FDA-preferred WOCF method, the response rate for the seven-month Core Treatment period was only ***53%***, considerably lower than the 65%

response rate Chiasma repeatedly touted. Chiasma's reporting of the LOCF-calculated response rates, paired with its failure to disclose that the FDA preferred a different method, was materially misleading.

97. The Registration Statement stated "65% of patients receiving oral octreotide twice a day for up to seven months achieved the primary endpoint, maintenance of biochemical disease control." This statement, as well as Chiasma's inclusion of drop-outs in the "% of Responders" (¶94) is misleading and created the appearance that the patients ***maintained*** "biochemical disease control" up to the end of the treatment phase, even if a patient had withdrawn early from the study.

98. These response rates were also materially misleading in light of the statement in the Registration Statement that, according to Chiasma's market research going back to 2010, "[e]ndocrinologists indicated that effectiveness in at least 50% of patients treated would be sufficient for an oral treatment to be successful." There is no indication the FDA agreed that a responder rate of 50% would indicate Mycapssa's efficacy. Thus, the Registration Statement's suggestion that the 65% responder rate showed efficacy because 50% was the mark to meet, was misleading because the 50% mark was arbitrary and not related to the FDA's approval process.

99. The statement in the Registration Statement that "[b]y the end of the six-month extension phase, or 13 months after first dosing, the responder rate was ***62%*** in the mITT group" is also materially misleading. 62% of the 151 mITT patient population is 93.62 people. However, only ***88 patients*** (58.2% of 151) elected to participate in the six-month extension phase. ¶94. In other words, Chiasma's representation that ***over 93 patients*** (62% of 151) were responding to the drug "13 months after first dosing," when only ***88 patients*** (58.2% of 151) even ***began*** the six-month extension phase, and only ***82 patients*** (54.3% of 151) actually ***completed*** the six-month extension phase, was materially misleading.

100. According to the Registration Statement, with respect to the "65% of patients receiving oral octreotide twice a day for up to seven months [who] achieved the primary endpoint, maintenance of biochemical disease control," "***[t]his biochemical disease*** control was durable." This statement was also misleading in light of the Registrant Statement's failure to disclose that,

during the May 2014 pre-NDA meeting with Roche and Chiasma, the FDA specifically questioned the ***durability*** of Mycapssa's effect on patients. Considering the durability of Mycapssa's effect on patients was directly relevant to the FDA's analysis of whether the drug was effective, Chiasma's failure to disclose this fact made this statement misleading.

101. The Registration Statement also stated "[t]he primary objective of the trial was to determine the efficacy of oral octreotide in patients with acromegaly, as measured by effect on IGF-1 and GH levels, with responders defined as patients who achieve an IGF-1 level less than 1.3 times the upper limit of normal." This statement was misleading because it failed to explain that the standard endpoint for measuring efficacy of acromegaly treatment was ***1.0 times*** the upper limit of normal, ***not 1.3 times***. Chiasma's reliance on this lower threshold to show efficacy, without explaining in the Registration Statement that 1.3 times the upper limit of normal ("ULN") was not a typical measuring point, or disclosing response rates that would have been calculated had the standard 1.0 threshold been implemented, was materially misleading.

102. The statement that Chiasma's competitive strengths included its ability to gain approval using shorter development timelines and lower associated expenses was materially misleading. The statement omits the fact that Chiasma's efforts to save time and money were counterintuitive to its attempts to gain FDA approval. After it received the CRL, it was revealed that Chiasma's Phase 3 Trial sites were all outside of the U.S. because the FDA required Chiasma to provide six months of monkey toxicity data and Chiasma only had three months. Instead of appeasing the FDA and conducting six months of tests, Chiasma went outside the U.S. for ***all*** of its sites, where many believe the data is less reliable. The FDA pointed to this issue and suggested that enrolling U.S. sites would potentially be a requirement for resubmission.

**B. The Registration Statement Informed Investors Chiasma Would Benefit from the 505(b)(2) Regulatory Pathway**

103. Chiasma's ability to proceed under the 505(b)(2) pathway was very important to Chiasma and investors (and analysts covering the Company). Chiasma's business model was to take an approved drug in injectable form and, using Chiasma's TPE delivery system, develop it into a

commercially-marketable oral form, using the FDA's 505(b)(2) approval pathway. Under this pathway, the applicant (*e.g.*, Chiasma) may seek to rely in part on the FDA's findings of safety and/or efficacy for the previously-approved drug (*e.g.*, the injectable drug). Thus, this pathway permits a sponsor like Chiasma to bring drugs to the market faster and with less new product development costs than if Chiasma had proceeded under a pathway in which it was not entitled to rely on previous efficacy findings or studies, such as through a 505(b)(1) application.

104. The Company's 505(b)(2) NDA strategy was listed in the Registration Statement as one of Chiasma's "Competitive Strengths." The Registration Statement stated, "***[o]ur business model and regulatory strategy utilizing the FDA's 505(b)(2) regulatory pathway target shorter development timelines and lower associated expenses***."

105. The Registration Statement made a number of other misleading assertions concerning Chiasma's use of the 505(b)(2) NDA pathway. In pertinent part, the Registration Statement included the following false and misleading statements:

> ***We have applied for regulatory approval of oral octreotide for the maintenance therapy of acromegaly in the United States utilizing the FDA's 505(b)(2) regulatory pathway*** and we will apply for regulatory approval in Europe utilizing the hybrid application pathway, which is analogous to the 505(b)(2) regulatory pathway. ***The 505(b)(2) pathway enables a potentially shorter development timeline compared to the development time for drugs that are new chemical entities by allowing us to rely, in part, on the FDA's prior findings of safety and efficacy for a previously approved product, or published literature, in support of our NDA***. In the case of oral octreotide in acromegaly, the approved product to which our NDA submission refers is the short-acting subcutaneous injectable formulation of octreotide previously approved by the FDA.
>
> * * *
>
> As we consider new peptide-based drugs to develop using our TPE platform, to reduce the development time and expenses and overall level of investment required, ***we intend to focus our efforts on drugs for which we may utilize the FDA's 505(b)(2) regulatory pathway*** in the United States and the hybrid application pathway in Europe.
>
> * * *

> Our pursuit of the 505(b)(2) regulatory pathway in the United States and the hybrid application pathway in Europe ***should allow shorter development timelines and reduced development expenses***. For oral octreotide, we generated proof of concept clinical data in healthy volunteers three years after we began development, completed our Phase 3 clinical trial in acromegaly within a further four years, and ***believe that we now have sufficient data to seek U.S. regulatory approval utilizing the FDA's 505(b)(2) regulatory pathway***. For comparison, the typical timeline for development of a new chemical entity, or NCE, under a traditional NDA program is over 10 years. ***We intend to continue to pursue product development opportunities where we believe the FDA's 505(b)(2) regulatory pathway and the hybrid application pathway in Europe are available***.
>
> * * *
>
> Our lead product candidate, oral octreotide, is based upon an already approved version of the same drug in an immediate-release formulation for subcutaneous injection, rather than a new chemical entity product candidate. Accordingly, ***we expect to be able to rely on information from previously conducted studies involving the immediate-release subcutaneous octreotide product in our clinical development plans and our NDA submission***.
>
> * * *
>
> In December 2014, we met with the FDA to discuss our clinical development of oral octreotide, including the full 13-month data from our Phase 3 clinical trial. ***At this meeting, the FDA advised us that it had not identified an issue that would preclude us from submitting an NDA for review***.

106. The statements in ¶¶104-105 above were materially untrue and omitted material information. In making these statements, Defendants failed to advise the public that the FDA had flagged multiple ***specific*** issues concerning Mycapssa and the NDA during pre-NDA meetings with the FDA, which threatened the chances of Mycapssa being approved by the FDA. The Registration Statement failed to disclose the fact that the FDA had expressed concerns to Chiasma and Roche about the duration of the Phase 3 Trial and the durability of Mycapssa's effect on patients – factors critical to proving the safety and efficacy of Mycapssa's modification of octreotide. The very fact that the FDA identified those issues risked delaying or denying FDA approval of Mycapssa. When Chiasma finally informed investors and others of these facts, which was well after the IPO, it assured investors that the FDA's questions had been answered to the FDA's satisfaction.

107. This omission was material considering, as explained *infra* at ¶¶54, 57-61, 80-82, 103, Chiasma's business model was premised on bringing drugs to market with shorter timelines. The FDA's concern with the short duration of the trial contrasted with this business model of shorter,

less expensive investigational periods. Chiasma did not alleviate the FDA's duration and durability concerns because the FDA specifically recommended in its April 15, 2016 CRL that Chiasma conduct another study of "sufficiently long duration." ¶118. Lengthening or altering the study in response to the pre-NDA discussions would have only delayed the NDA process and cost Chiasma substantial, additional money.

108. Moreover, the statements regarding Chiasma's utilization of the 505(b)(2) pathway for seeking approval of the NDA, *see* ¶¶104-105, were materially misleading because they omitted that the FDA had previously questioned Chiasma's ability to successfully proceed under the 505(b)(2) pathway. Subsequent to the IPO, Mamluk informed investors that the FDA had already raised concerns about the validity of Chiasma's use of the 505(b)(2) pathway. ¶115. Importantly, Mamluk also revealed that the FDA's comments were material enough that Roche decided to end its agreement with Chiasma. *See* ¶¶74-75.

109. The statements in the Registration Statement concerning Chiasma's plan to benefit from the shorter timeframe and lower costs associated with 505(b)(2) approval were misleading because the use of the TPE platform to orally deliver the octreotide, as opposed to an injection, affected the efficacy of the drug. The use of the 505(b)(2) pathway is reserved for drugs where efficacy has already been proven and the sponsor relies on prior efficacy trials to support the NDA. The Registration Statement did not disclose that because octreotide is a large molecule drug, it is difficult to deliver the drug in a capsule, and as such, the Company could not simply rely on prior efficacy studies of the injectable form of octreotide, as would be common with a 505(b)2 application. Instead, as the FDA warned prior to the IPO, Chiasma needed to conduct an efficacy trial that would produce substantial and reliable efficacy data. The Company attempted to convince the public that efficacy was similar by using the LOCF method, instead of the FDA-preferred WOCF, and calculating responses based on 1.3 x ULN, instead of the commonly used 1 x ULN. Designing the Phase 3 Trial in this manner, unbeknownst to investors, only gave the appearance of efficacy and misled investors regarding the prospects for Mycapssa's regulatory approval.

110. Chiasma's use of short-acting injectable formulation of octreotide as the reference drug was also misleading because patients in the Phase 3 Trial received injections of the ***long-acting*** version of octreotide during the baseline phase of the trial, as they were all patients already being treated for acromegaly. The capsules that Phase 3 patients received were manufactured with the ***short-acting*** form of octreotide (the product to which Chiasma's NDA referred, which had been approved in generic form by the time the NDA was submitted). Defendants failed to disclose in the Registration Statement that the FDA had specific concerns that the long-acting injectable formulation that Phase 3 subjects had been receiving (prior to being switched over to the short-acting oral octreotide capsules) ***continued*** to impact the patients' symptoms after switching to Mycapssa. The Registration Statement did not explain the FDA's concern that the number of Mycapssa "responders" at the seven-month period reflected a residual effect from the long-acting injectables, part of a downward trend that was ***not due to the efficacy of oral octreotide***.

111. The untrue statements and omitted information were also material in light of the fact that Chiasma did not perform a Phase 2 Trial. As explained above, a Phase 2 Trial allows a company to implement "well controlled" studies to "evaluate the ***effectiveness*** of the drug" and "to determine the common short-term side effects and risks associated with the drug." ¶42. In this case, ***there was no Phase 2 data*** to analyze Mycapssa's efficacy or safety. The short and uncontrolled Phase 3 Trial described in the Registration Statement provided the ***only*** Mycapssa efficacy data outside of the Phase 1 Trial.

### C. The Registration Statement Misrepresented the Nature of Roche Terminating Its Partnership with Chiasma

112. As explained *supra* at ¶¶69-76, Chiasma signed the Roche Licensing Agreement with Roche in December 2012, under which Roche would have eventually assumed responsibility for the development and commercialization of Mycapssa. Chiasma received more than $85 million from Roche pursuant to the terms of the deal, which included an upfront payment of $65 million, before Roche walked away from the deal in July 2014. ¶74. Mamluk misled the public in August 2014 by

stating that Roche's decision to terminate the deal was a "strategic decision by them [Roche] whether or not to become more deeply involved in the endocrinology sector," indicating the decision was not due to a "problem with the [Phase 3 Trial] results." ¶75. The Registration Statement also materially misrepresented the Company's failed partnership with Roche, including the following statement:

> [I]n July 2014, F. Hoffmann-La Roche Ltd. and Hoffmann-La Roche Inc., collectively Roche, elected to terminate our license agreement for oral octreotide after reviewing the data from the seven-month core treatment period of our Phase 3 clinical trial and after a May 2014 pre-NDA meeting with the FDA. ***Roche cited no reason for its decision in its formal notice of termination, but stated publicly at the time that it had elected to make this decision after receiving additional information about our Phase 3 clinical trial and after further consultation with regulatory authorities***. Subsequent to this decision, we independently met with the FDA to discuss the clinical development of oral octreotide, including the Phase 3 clinical results from the six-month extension phase of the clinical trial. ***At this meeting, the FDA advised us that it had not identified an issue that would preclude us from submitting an NDA for review***.

113. In reality, Roche was provided non-public information concerning Mycapssa and the Phase 3 Trial just prior to terminating the Roche Licensing Agreement. Subsequent to the IPO, the Company revealed that Roche terminated the Roche Licensing Agreement after a meeting with the FDA in May 2014, during which the FDA raised questions about Mycapssa's durability, the study's duration, and the validity of the 505(b)(2) pathway. ¶115. The CRL confirmed Roche's decision to withdraw its investment in Mycapssa was a prudent one, informed by information provided to Roche (and Chiasma) by the FDA but not disclosed to investors in the IPO.

114. As one article dated August 14, 2016, put it:

> Chiasma had undergone [a] crisis in the past, when drug company Roche, which acquired the drug development rights [to Mycapssa], returned them to Chiasma after the end of a single-arm trial. However, ***Chiasma had convinced the market that the cancellation had been due to Roche's own considerations and does not follow from any problems with the drug***.

## VI. POST-IPO EVENTS

115. After the market closed on November 18, 2015, Chiasma held a quarterly earnings conference call, Leuchtenberger and Mamluk participated on the call on Chiasma's behalf. During the call, Chiasma made a partial disclosure of certain material information that had been omitted from the Registration Statement. This information included the fact that during the May 2014 pre-NDA meeting with Roche and Chiasma, the FDA raised specific questions about (1) Chiasma's ability to seek approval of the NDA under the FDA's 505(b)(2) pathway; (2) the duration of the Phase 3 Trial; and (3) the durability of Mycapssa's effect on Phase 3 Trial subjects. Following this disclosure of the true reason Roche terminated its deal with Chiasma and the FDA's concerns with Mycapssa, on November 19, 2015, Chiasma's stock closed at $19.62 per share, a decrease of approximately 6.88% from the previous trading day's closing price of $21.07.

116. Reaction to these revelations was not severe because of other statements provided to the public during the November 18, 2015 call. During the call Mamluk assured that Chiasma had essentially addressed the FDA's concerns and there was "no question any more on durability" or the 505(b)2 pathway. Mamluk confirmed that Chiasma "ha[s] a clear path forward with the FDA."

117. On April 14, 2016, prior to the Company making an announcement, news that the FDA would reject the Mycapssa NDA began to leak into the market. Before the market opened, *The Street* published an article entitled "Chiasma's Acromegaly Drug Headed for FDA Rejection, Investor Says." The article stated that a reliable source "believes the FDA will reject the Chiasma capsules, known as Mycapssa, because data from the company's pivotal, single-arm study failed to demonstrate a clinically meaningful benefit for acromegaly patients." According to the article's source, the FDA rejection was "because Chiasma's threshold for IGF-1 response – 1.3 times the upper limit of normal – was set arbitrarily only to make the efficacy of the drug look better." The article covered other revealing information about the FDA's rejection, including the following:

> In Europe, for example, the efficacy standard for acromegaly used historically is to normalize IGF-1 levels to less than 1 times the upper limit of normal. ***No one but Chiasma uses the 1.3 times the upper limit of normal standard***.
>
> Using the more common and stricter definition of response, only 30% to 40% of acromegaly patients responded to Mycapssa treatment, according to Chiasma's published study data. That's below the 50% response threshold needed to demonstrate clinically meaningful efficacy.
>
> There were other problems with the study analysis, including a large number of patient dropouts, due in part to difficulties with Mycapssa dosing. There was no fixed dose of Mycapssa. Instead, multiple doses, some higher, some lower, were used during the study to get acromegaly patients under control. Response didn't correlate with dose – evidence that Chiasma's technology does a poor job turning injectable drugs into something that is reliably available by mouth.
>
> Chiasma might have overcome these issues if its registration study contained a control arm to compare against the efficacy and safety of Mycapssa. The company chose, instead, a single-arm study with all patients treated with the drug. This leaves the company little room for error. FDA tends to take a very conservative stance with single-arm studies.

118. On April 15, 2016, after the close of trading, Chiasma announced that the FDA issued a CRL regarding Chiasma's NDA for Mycapssa. The CRL indicated that the FDA's review of the NDA was complete and that it was not ready for approval in its present form. Before the market opened on April 18, 2016, Chiasma issued another press release concerning the CRL. The Company announced the following:

> [T]he FDA advised Chiasma that the Agency did not believe ***the company's application had provided substantial evidence of efficacy to warrant approval***, and advised Chiasma that it would need to conduct another clinical trial in order to overcome this deficiency. The FDA expressed concerns regarding certain aspects of the company's single-arm, open-label Phase 3 clinical trial and strongly recommended that the company conduct a randomized, double-blind and controlled trial that enrolls patients from the United States and be of sufficiently long duration to ensure that the control of disease activity is stable at the time point selected the primary efficacy assessment. In addition, the FDA advised that, during a recent site inspection, certain deficiencies were conveyed to the representative of one of Chiasma's suppliers that would need to be resolved before approval.

119. Before the market opened on April 18, 2016, Chiasma held a conference call to address the FDA's CRL. During the conference call, Leuchtenberger stated the following:

> Upon completion of its review, the FDA advised in its letter that it did not believe the Company's application had provided substantial evidence of efficacy to warrant approval. The FDA expressed concerns regarding certain aspects of our Phase 3 trial, which was a single-arm, open-label trial, and has advised us to conduct another trial. The Agency strongly recommended that this be a randomized, double-

> blinded, controlled trial that enrolls patients from the United States, and that is long enough to ensure that control of disease activity is stable at the time point selected for the primary endpoint assessment.
>
> In addition, the letter said that, during a recent site inspection the FDA noted certain deficiencies that were conveyed to a representative of one of our suppliers that would need to be resolved before approval. I would like to point out here that the FDA did not note any safety concerns related to Mycapssa or to our transient permeability enhancer, or TPE, technology platform in its letter to us.
>
> * * *
>
> The trial also showed that Mycapssa's safety profile was similar to injectable somatostatin analogs, with the most common adverse events in the trial being nausea, diarrhea, headache, joint pain, fatigue, and excessive sweating. We believe there were valid reasons for our trial design and for our NDA filing. Prior to initiating the trial, we reviewed the design of this trial with FDA at our end of Phase 2 meeting. The FDA minutes of this meeting reflect that the FDA communicated that the overall plan for the proposed Phase 3 study was acceptable. ***Of course, these acceptances by the FDA are not always binding***.
>
> ***At our December 2014 type C meeting, while the FDA did communicate that the interpretability and sufficiency of the trial results would be a review issue and suggested that a single-arm study is not as informative as a controlled study, the Agency said in response to our question that it did not identify an issue that would preclude us from filing an NDA***. This NDA was accepted by the FDA for review in August 2015.

120. Analysts swiftly downgraded Chiasma's stock rating and price target following news of the CRL. On April 17, 2016, an Oppenheimer analyst report lowered Chiasma stock price target from $43 to $9, and was "pushing out revenues three years" in its valuation of Chiasma.

121. Following the April 18 conference call, as more news concerning the CRL was revealed, analysts following the Company issued reports with more details of the FDA's concerns. An April 18, 2016 William Blair analyst report downgraded Chiasma from "Outperform" to "Market Perform," lowering its target price from $40.00 to $6.00. The William Blair analysts revealed some of the concerns the FDA likely had with the Phase 3 Trial:

> Chiasma submitted a 505(b)(2) NDA filing for Mycapssa based on a U.S. Phase III single arm, open-label switch study where patients on injectable somatostatin analogs were given Mycapssa and measured for biochemical control at 7 months and 13 months. The company reported results that showed biochemical response rates at baseline of 89% of patients, 65% at month seven, and 62% at the end of the 13-month extension period. ***The response rates were calculated using a last observation carried forward (LOCF) method against baseline responders. In an analysis using the FDA-requested worst observation carried forward (WOCF) measure, the month-seven response rate was 53%, near the 50% benchmark,***

> ***which is viewed as clinically relevant among physicians. We believe that part of the FDA's conclusion of lack of substantial efficacy analysis was potentially because of the cutoff for biochemical control of 1.3 x ULN (upper limit of normal) for IGF-1 in the analysis versus the 1 x ULN commonly used and in general the method of analysis used to calculate "response***."

122. On April 19, 2016, a Cowen analyst report downgraded Chiasma from "Outperform" to "Market Perform" and removed its price target entirely (previously set at $32). The Cowen analyst report explained its position as follows:

> We are downgrading CHMA to Market Perform on ***lack of clarity on the regulatory path forward*** in the US after Friday's complete response letter from FDA. The CRL indicates FDA "concern" around the design and robustness of the efficacy data of CHMA's single-arm, open-label 13-month Ph3 trial and "strongly recommended" CHMA conduct a randomized, double-blind and controlled trial with US patients "of sufficiently long duration to ensure that control of disease activity is stable." . . .
>
> Further, ***CRL language implied FDA focus on the strength of the clinical data in the NDA, which means we cannot preclude issues with the patient level data despite overall positive analysis as presented in the Ph3 publications***. The particulars of FDA's concerns on the data itself (vs. trial design) will be covered at the Type A meeting. ***CHMA believes it is still eligible for the 505b2 review path which we are uncertain***, but expects to confirm it at the upcoming Type A meeting.

123. On April 22, 2016, a Barclays analyst report also downgraded Chiasma's stock rating from overweight to underweight and price target from $40.00 to $5.50. The Barclays analyst report revealed a number of issues with the Phase 3 Trial that were not disclosed in the Registration Statement, including the following:

> Based on CHMA's disclosures around the CRL rationale, the agency felt the single-arm design did not sufficiently support efficacy claims to warrant approval. Instead, the agency indicated potential need for a double-blind randomized controlled trial (RCT). A placebo controlled trial seems impractical, if not unethical, which suggests non-inferiority trial like the one being done in Europe. The FDA could seek a trial that is somehow blinded, which the European trial is not, so a new trial is not completely out of the question. Interestingly, at the ENDO conference earlier this month, principal investigator Dr. Shlomo Melmed, noted that non-inferiority to injectable should not be a question for the FDA since the underlying octreotide molecule is identical and comparability was demonstrated in preclinical studies.
>
> ***Dr. Melmed confirmed that the FDA did not have any concerns regarding safety, as reiterated by CHMA in the CRL press release, but did not[e] that there were "repetitive" questions on outcomes, stemming from the unusual trial design***.
>
> Another key point for the agency was the absence of US sites in the Phase 3 trial, which the agency outlined as a potential requirement for resubmission. Here, we feel CHMA got ahead of itself, ***according to management and Dr. Melmed, US***

> ***sites were not enrolled because the FDA wanted six months of monkey toxicity data and the company at that time only had three months of data***. However, Melmed noted that the ex-US sites involved in the trial showed little variability in attrition and adverse event rates.

124. The price of Chiasma common stock plummeted as the market learned the full extent of the truth. On April 18, 2016, the price of Chiasma stock closed at $3.75 per share, a decrease of over 63% from the closing price of $10.17 on April 15, 2016, the previous trading day. As of June 9, 2016, the date this action was brought, Chiasma common stock closed at $3.14 per share, ***down over 80% from its $16.00 IPO offering price***.

## VII. CLASS ACTION ALLEGATIONS

125. Lead Plaintiff brings this action as a class action on behalf of all persons who purchased or acquired Chiasma common stock pursuant or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

126. The members of the Class are so numerous that joinder of all members is impracticable. Chiasma common stock has at all times traded on the NASDAQ stock market. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Chiasma or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

127. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

128. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and federal securities litigation.

129. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act;

(b) whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c) the extent to which members of the Class have sustained damages and the proper measure of damages.

130. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation renders it practically impossible for members of the Class to individually seek redress of these claims. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of Section 11 of the Securities Act**
**Against All Defendants**

131. Lead Plaintiff incorporates ¶¶1-130 by reference.

132. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. For purposes of this Count, Lead Plaintiff does not claim that Defendants engaged in intentional or reckless misconduct or that Defendants acted with fraudulent intent.

133. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

134. Chiasma was the registrant for the IPO. As the issuer of its common stock, Chiasma is strictly liable to Lead Plaintiff and the Class for the materially inaccurate statements in the Registration Statement and for the failure of the Registration Statement to be complete and to disclose the material information required pursuant to the regulations governing its preparation.

135. The Individual Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants had a duty to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact. As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

136. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Individual Defendants are strictly liable to Lead Plaintiff and the Class.

137. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration

Statement were true and without omissions of any material facts and were accurate. By reasons of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

138. Lead Plaintiff acquired Chiasma common stock traceable to the IPO.

139. Lead Plaintiff and the Class have sustained damages. The value of Chiasma common stock has declined substantially subsequent to and due to Defendants' violations.

140. At the time of their purchases of Chiasma common stock, Lead Plaintiff and the other Class members were without knowledge of the facts associated with the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Amended Complaint is based to the time that Lead Plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff commenced this action.

**COUNT II**
**For Violation of Section 15 of the Securities Act**
**Against the Individual Defendants**

141. Lead Plaintiff incorporates ¶¶1-140 by reference.

142. This Count is brought pursuant to §15 of the Securities Act against the Individual Defendants.

143. The Individual Defendants each were control persons of Chiasma by virtue of their positions as directors and/or senior officers of Chiasma. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Chiasma.

144. The Individual Defendants each were culpable participants in the violations of §11 of the Securities Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff on behalf of himself and the Class, prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as a class representative and Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees and other costs and disbursements; and

D. Awarding Lead Plaintiff and the Class such other and further relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: February 10, 2017

JOHNSON & WEAVER, LLP
MICHAEL I. FISTEL, JR.

s/ MICHAEL I. FISTEL, JR.
MICHAEL I. FISTEL, JR.

40 Powder Springs Street
Marietta, GA 30064
Telephone: 770/200-3104
770/200-3101 (fax)
michaelf@johnsonandweaver.com

ROBBINS GELLER RUDMAN
& DOWD LLP
BRIAN O. O'MARA
RYAN A. LLORENS
CHRISTOPHER D. STEWART
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bomara@rgrdlaw.com
ryanl@rgrdlaw.com
cstewart@rgrdlaw.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: 619/230-0063
619/255-1856 (fax)
frankj@johnsonandweaver.com

Lead Counsel for Lead Plaintiff

HUTCHINGS BARSAMIAN MANDELCORN, LLP
THEODORE M. HESS-MAHAN, BBO #557109
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: 781/431-2231
781/431-8726 (fax)
thess-mahan@hutchingsbarsamian.com

Liaison Counsel for Lead Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 10, 2017.

s/ MICHAEL I. FISTEL, JR.
MICHAEL I. FISTEL, JR.

JOHNSON & WEAVER, LLP
40 Powder Springs Street
Marietta, GA 30064
Telephone: 770/200-3104
770/200-3101 (fax)

E-mail: michaelf@johnsonandweaver.com